**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

In the Matter of:          }
          }
          }
Brian C. Beasley,      }   Case No. 18-04268-DSC13
          }
          }   Chapter 13
      Debtor.     }

**<u>MEMORANDUM OPINION</u>**

This matter is before the Court on Katherine Leigh Beasley's Objection to Confirmation of Plan and Motion to Dismiss, or Alternatively, Convert Case to Chapter 7 (the "Objection to Confirmation") and Brian C. Beasley's Objection to Claim (the "Claim Objection"). (Docs. 19, 23.) This Court held an evidentiary hearing on the Objection to Confirmation and Claim Objection on May 23, 2019. Appearing at the hearing were the Debtor and his counsel, Ted Stuckenschneider; the Creditor and her counsel, Chris Glenos and Andrew Shaver; and a non-party witness, Heather Thomas. An additional non-party witness, Dr. Brad Beasley, testified on May 31, 2019, when the hearing was concluded.[1]

The Court has jurisdiction to hear these matters pursuant to 28 U.S.C. §§ 157 and 1334, and the General Order of Reference, as amended, entered by the United States District Court for the Northern District of Alabama. This is a core proceeding under 28 U.S.C. § 157(b)(2).

---

[1]    Dr. Brad Beasley was not available to testify at the May 23, 2019, evidentiary hearing due to a scheduling conflict with his dental practice. Accordingly, the evidentiary hearing was continued until May 31, 2019, when he could testify.

Based upon the filings, the evidence and testimony, representations and arguments of the parties, and for the reasons set forth herein, the Court **FINDS** and **CONCLUDES** as follows:[2]

## INTRODUCTION

This Court is the latest stop on the parties' litigation journey, a saga which began in North Carolina and continues to unfold in Alabama. Brimming with protracted domestic relations proceedings and allegations of egregious conduct by the Debtor, the legal disputes between Brian and Leigh have endured for more than three years. This is the third court and the undersigned is at least the fourth jurist to adjudicate claims spawning from the Beasley's irreconcilable differences. Notwithstanding, the parties have now landed in bankruptcy court, with no end in sight for their divorce disputes. Indeed, this Court has previously entered a consent Order allowing them to proceed in the Circuit Court of Madison County, Alabama, as to "certain domestic issues." (*See* Doc. 55.) Even though this Court is not the end of the litigation road for Brian and Leigh, it is nevertheless a critical juncture where equity prevails.

## FINDINGS OF FACT

### 1. The Debtor's Prepetition Conduct and Relevant Background

The factual background to this case is well-documented. Brian and Leigh Beasley were married on July 17, 1999. (Doc. 19, Ex. G at ¶ 1.) In 2010, Leigh gave birth to their son, who is their only child. (*Id.* at ¶ 2, the "Minor Child".) After more than sixteen years of marriage, the couple separated on September 2, 2015. (*Id.* at ¶ 1.) Prior to their separation, Brian engaged in

---

[2]      Pursuant to Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of the contents of its own files and does so in this case. *See ITT Rayonier, Inc. v. U.S.*, 651 F.2d 343 (5th Cir. Unit B July 1981); *Florida v. Charley Toppino & Sons, Inc.*, 514 F.2d 700, 704 (5th Cir. 1975).

Case 18-04268-DSC13   Doc 92   Filed 07/03/19   Entered 07/03/19 17:28:48   Desc Main
Document     Page 2 of 41

extramarital relations including marital misconduct with his now fiancée, Heather Thomas. (*Id.* at ¶ 24.)

Brian filed a complaint for divorce from Leigh in North Carolina on September 25, 2015. (Doc. 19, Ex. G at ¶ 3.) The North Carolina state court adjudicated many of the domestic relations matters pertinent to their separation, including post-separation support, child custody, child support, equitable distribution, and alimony. In 2016, Brian moved to Alabama and he currently resides in Birmingham at a house owned by Ms. Thomas. Brian filed for divorce from Leigh a second time, before the Circuit Court of Madison County, Alabama, on or about January 26, 2017. (*See* Doc. 19, Ex. H.) Leigh also moved to Alabama, and she is a student in graduate school at the University of Alabama in Huntsville (UAH). Brian and Leigh's divorce became final when the Alabama state court entered a Final Judgment of Divorce on July 27, 2018. (*Id.*)

Over the course of litigating domestic disputes between Brian ("Debtor") and Leigh ("Creditor"), both North Carolina and Alabama courts have found facts in their respective orders that painted an unflattering picture of the Debtor. One judgment, in particular, assimilated facts from various proceedings and orders that framed a compelling narrative of misconduct by the Debtor. And that judgment – the equitable distribution judgment – stated that "[t]his matter has been heavily litigated" due to the Debtor's "utter lack of regard for the judicial process, repeated failure to abide by the Orders of this Court and blatant disregard of the Orders of this Court." (Doc. 19, Ex. C at ¶13, the "Equitable Distribution Judgment".) [3]

---

[3]     This citation is to the North Carolina Equitable Distribution Judgment.  As indicated above, the Equitable Distribution Judgment is found in the docket as Exhibit C to Document 19 (Objection to Confirmation of Plan and Motion to Dismiss, or Alternatively, Convert Case to Chapter 7).  The Court notes that the Equitable Distribution Judgment was also admitted into evidence at the evidentiary hearing as Creditor Exhibit 5.

This judgment was entered in a North Carolina state court by Judge Gordon A. Miller on June 15, 2017. (*See* Doc. 19, Ex. C.) It included a procedural history that did not reflect favorably upon the Debtor. For example, the Debtor did not pay child support or post-separation support as ordered, which led to a motion for contempt and attorney fees. (*Id.* at ¶13(c).) Because the Debtor failed to appear for the contempt hearing, the North Carolina state court entered a commitment order for civil contempt and directed that he be taken into custody until the contempt was purged. (*Id.*) The Debtor did not purge his contempt, nor did he appear in court for a hearing on attorney fees. (*Id.* at ¶ 13(d).) That resulted in an order awarding attorney fees in the amount of $48,188.15 against Debtor with a payment deadline of December 31, 2016. (*Id.*) As chronicled by the North Carolina state court, that deadline came and went without any payment from the Debtor. (*Id.*)

The North Carolina state court also documented the Debtor's failure to comply with discovery requests and a second contempt motion for failure to pay post-separation support. (Doc. 19, Ex. C at ¶ 13(e), (h), (i).) When the Debtor failed to appear for the second contempt hearing, another civil commitment order was entered against him for post-separation support arrears ($24,153.71), attorney fees for the first and second contempt motions ($3,000), as well as attorney fees pursuant to the attorney fee order ($48,188.15). (*Id.* at ¶ 13(j).) The Order for Attorney Fees ($48,188.15) remains outstanding and comprises a portion of the Creditor's claim in this bankruptcy case. (Claim No. 7.) The North Carolina state court also noted the Debtor's absence and non-participation at the specially set equitable distribution trial, "as was his history throughout the case." (*Id.* at ¶ 14.)

The Debtor's failure to appear in court, failure to comply with court orders, failure to meaningfully respond to discovery, and failure to meet his post-separation support obligations was not lost on the North Carolina state court. Indeed, it described the Debtor's conduct as "egregious

and without excuse" and "not like anything this Court has ever seen or experienced before." (Doc. 19, Ex. C at ¶ 77(g), (h).) And when this case made its way to an Alabama state court, the Debtor was found in contempt of court on a "total of ninety-four (94) separate incidences." (Doc. 19, Ex. H. at ¶ 10.)[4] In holding the Debtor in contempt, the Alabama state court determined that he "willfully and contemptuously failed to pay toward the judgments he was so Ordered to do." (*Id.* at ¶ 6.) This determination was based, in part, on the fact that the Debtor "continued to travel and take vacations, has continued to purchase sports memorabilia, continues to attend sporting events, and continues to pay his own expenses, including non-essential items" yet he failed to make any payments toward the outstanding judgments of $133,445.06 against him.[5] (*Id.*) The Alabama state court also found that the Debtor had been "continuously employed and receives substantial compensation from his employer." (Doc. 19, Ex. H at 105.) And that, "[a]dditionally, the Husband [Debtor] admitted that he derives additional income from his sales of sports memorabilia." (*Id.*) He was sentenced to "incarceration within the Madison County Jail for five days for each incident, for a total of four hundred seventy (470) days." (*Id.* at ¶ 10.) The sentence was to remain suspended provided the Debtor complied "with all previous orders and specific orders contained herein." (*Id.*)

This Final Judgment of Divorce was entered on July 27, 2018. (*Id.*) Almost three months later, on October 16, 2018, a Motion for Implementation of Jail Sentence was filed; citing, in part, the Debtor's failure to comply with the July 2018 Final Judgment of Divorce despite receiving an

---

[4]      This citation is to the Final Judgment of Divorce from the Circuit Court of Madison County, Alabama. As indicated above, the Final Judgment of Divorce is found in the docket as Exhibit H to Document 19 (Objection to Confirmation of Plan and Motion to Dismiss, or Alternatively, Convert Case to Chapter 7). The Court notes that the Final Judgment of Divorce was also admitted into evidence at the evidentiary hearing as Creditor's Exhibit 11.

[5]      This Court notes that, during the Debtor's testimony at the evidentiary hearing in bankruptcy court, the Debtor did not deny taking vacations. He challenged any implications therefrom by testifying that he did not pay for his vacations.

income tax refund and employment bonus. (Creditor's Ex. 13.)[6] Perhaps fearing incarceration, the Debtor complied with one aspect of the July 2018 Final Judgment of Divorce insofar as he paid for the uncovered medical expenses ($6,507.35) for the Minor Child. (*See* Creditor's Ex. 11.) In his verified response to the Motion for Implementation of Jail Sentence, the Debtor averred that his March 2018 bonus "was utilized to accommodate expenses related to his move to Birmingham, AL to be closer to his son and for his new job." (Creditor's Ex. 14.) The verified response made no mention of the Debtor's income tax refund. (*Id.*) On October 19, 2018, a day after responding to the motion for implementation of jail sentence and three days after the same was filed, the Debtor filed a voluntary petition for chapter 13 bankruptcy. (Doc. 1.)

At the evidentiary hearing before this Court, the Debtor admitted to making mistakes and acknowledged that he did not handle the divorce appropriately. He testified that he views the instant chapter 13 bankruptcy as the only avenue to "make this as right as possible" and that if he goes to jail, he will "be no good to anyone" without any income.

### 2. The Sports Memorabilia

During the Beasleys' marriage, the Debtor bought and sold sports memorabilia. And at one time, four or five years ago, he made significant money doing so. The Debtor's sports memorabilia became the subject of the Equitable Distribution Judgment. On August 25, 2015, as recounted by the North Carolina state court, the Creditor served the Debtor and Ms. Thomas with spoliation letters. (Doc. 19, Ex. C at ¶ 3.) The North Carolina state court found that "[w]ithin hours after receiving the spoliation letter, Husband [Debtor] returned to the marital residence and began to systematically move property, including sports memorabilia, from the martial residence to other

---

[6]     When possible, the documents cited herein reference this Court's docket.  To the extent documents cited herein were admitted as trial exhibits but were not included as part of this Court's docket, they are referenced by the exhibit number under which they were admitted into evidence.

6

locations, including but not limited into [sic] a storage unit Wife [Creditor] did not know Husband [Debtor] had rented." (*Id.*) The court valued the sports memorabilia at $195,000, which included memorabilia removed from the marital residence as well as that left behind. (Doc. 19, Ex. C at ¶ 26.) The court's valuation was based, in part, on an inventory compiled at an inspection of the Debtor's storage unit and apartment, photographs of the sports memorabilia, an eBay bidding history, a PayPal report, valuation of 13 boxes and 24 sets of baseball cards, valuation of two racks of minor league jerseys and three racks of major league jerseys, and an "additional six storage tubs of sports memorabilia." (Doc. 19, Ex. C at ¶ 26.) The court found that the sports memorabilia in the Creditor's possession was worth $5,000 and the memorabilia in the Debtor's possession was worth $190,000. (*Id.*) The sports memorabilia valued at $5,000, and in the Creditor's possession, was distributed to her; while the sports memorabilia valued at $190,000, and in the Debtor's possession, was distributed to him. (*Id.*) Ultimately, the court awarded the Creditor a distributive award payment of $108,612.14 under the Equitable Distribution Judgment, finding that the Debtor had the "means and ability" to make the payment because he had sports memorabilia with a "fair market value of at least $190,000, which he has the ability to sell." (*Id.* at 80.)

The Creditor contends that a portion of her claim is secured by $190,000 of sports memorabilia. The Debtor denies that he has, or ever had, sports memorabilia worth $190,000.[7] According to his bankruptcy petition, the sports memorabilia still in his possession is worth only $500. (Doc. 1 at 10.) But this amount does not include almost $3,500 worth of sports memorabilia purchased for the Minor Child and kept at the Debtor's residence. (Debtor Ex. 11, Supplemental Interrogatory Responses.) As far as the $190,000 valuation of sports memorabilia by the North Carolina state court, the Debtor claims it was inaccurate insofar as it accounted only for purchases

---

[7]     It is worth mentioning that the Debtor had the opportunity to appear at the hearing before the North Carolina state court and contest these values, but he did not do so.

7

of memorabilia, not sales of the same. To that end, he submitted a list of eBay sales from 2000-2018 with purported sales totaling $63,927.99. (Debtor Ex. 7.) A list of sports memorabilia, representing what the Debtor contends he sold from July 5, 2017 (when the Equitable Distribution Judgment was entered) until August 25, 2018 (the date after which he allegedly never sold any more memorabilia), indicated sales totaling $8,460.32. (Debtor Ex. 6.)

### 3. The Beasley Trust

Much has been made in this case about a trust created for the Debtor's parents, Robert and Mauveline Beasley. The trust was formed on July 17, 2013, just over two years before the Debtor filed for divorce from the Creditor. (Creditor Ex. 23.) Its trustee, Dr. Brad Beasley, is the Debtor's brother. He produced the trust document pursuant to a subpoena and testified at the evidentiary hearing. According to Dr. Beasley, the trust was created with the intention of providing for the needs of his parents (Robert and Mauveline Beasley), and to protect their assets. The Creditor submitted the trust agreement into evidence and then solicited testimony about the same in attempt to show a different intention – that the trust was created to protect the Debtor's future inheritance from the Creditor. Two trust provisions – a provision excluding the Debtor as a beneficiary during Robert and Mauveline's lifetime, and a provision that allows Dr. Beasley to control the timing of the distribution of the Debtor's 50% share upon their parents' death – evinced this intention, the Creditor contends. (Creditor Ex. 23 at §1.07; §4.03.) A contention which Dr. Beasley did not outright deny; in fact, he testified that part of the intent in creating the trust was to protect his parents' assets and that there was "concern" for doing this "back from the very beginning of [the Creditor's] challenges [as] she had issues with many members of our family."

The Creditor also referenced the trust account to make an additional point, *i.e.*, contrary to the terms of the trust, numerous payments were made to the Debtor, to his legal counsel, and to

8

Ms. Thomas. These payments totaled $76,885.27 prepetition and $8,900 postpetition from the Trust Checking Account and an additional $18,781.25 prepetition from the Trust Brokerage Account. (Creditor Ex. 22.) And many of the payments were issued to Ms. Thomas in $1,000 increments. (*Id.*) The Debtor denied that the payments to Ms. Thomas, who owns the home where he resides, were for rent, even though his verified response to the Alabama state court on the Motion for Implementation of Jail Sentence indicated that his expenses included $1,000 for rent and utilities. (Creditor Ex. 14.) Instead, both the Debtor and Dr. Beasley insisted that the $1,000 payments covered the cost of hotels and related expenses that Ms. Thomas incurred as a result of leaving her home during the Minor Child's visitation with the Debtor. Many of the payments from the trust were checks written and signed by the Debtor's mother, Mauveline, who is a trust grantor. Dr. Beasley testified that he approved, after the fact, of the payments Mauveline made to the Debtor, his legal counsel, and Ms. Thomas. He further testified that the funds in the trust were his parents' and that he was just honoring their wishes, which included expending their funds to protect their son.

Outside of the trust payments, the Creditor presented evidence of expenditures by the Debtor using a debit card drawn on his parents' personal checking account. The Debtor testified that he used his parents' debit card for their benefit, *i.e.*, to buy them groceries or to take them something to eat. And he testified that he very seldom used the card for his personal use. A summary of his parents' bank statements, however, indicated numerous expenses in the Birmingham and Hoover areas even though his parents live in Decatur and do not drive. (Creditor Ex. 21.) According to the Creditor, the expenditures totaled approximately $9,412.98. (*Id.*)

### 4. Relevant Court Orders and Recorded Judgments

9

The Creditor's proof of claim in this case is for $263,217.33. (Claim No. 7.) It is comprised, in part, of amounts awarded to her in three separate orders and judgments. (*See id*.) Judge Lisa V.L. Menefee in North Carolina ruled in favor of the Creditor on December 18, 2016 and awarded attorney fees related to claims for child custody ($21,466), claims for child support ($16,722.15) and a claim for post-separation support ($10,000), for a total award of $48,188.15. (Doc. 19, Ex. B.) The second award generated from the Equitable Distribution Judgment entered on June 15, 2017, in the amount of $108,612.14. (Doc. 19, Ex. C.) The third award, also entered on June 15, 2017, was an order for sanctions and attorney fees in the amount of $30,950.85. (Doc. 19, Ex. D, the "Sanctions Order".) The Creditor has provided this Court with certificates of judgment purportedly recorded in the Alabama probate courts for Shelby, Jefferson, and Madison counties. (Doc. 19, Ex. F.) In her proof of claim, the Creditor adjusts these award amounts to include interest, increasing the amount claimed to $208,692.01. (Claim No. 7.)

In addition to the three North Carolina judgments, the Creditor claims she is owed $49,783.82 in domestic support obligation ("DSO") arrears pursuant to the Final Judgment of Divorce entered on July 27, 2018, by the Circuit Court of Madison County, Alabama. (Claim No. 7.) The Final Judgment of Divorce ordered the Debtor to make domestic support payments of $5,116 monthly, which amount includes $3,000 for alimony, $1,116 in child support, and $1,000 in arrears. (Doc. 19, Ex. H.) Regarding this judgment, the Creditor claims the Debtor owed her $48,629.54, including $47,783.82 in principal, $845.72 in interest, and that $4,141.97 of this amount are in arrears, at the time he filed for bankruptcy. (Claim No. 7.) As to the three North Carolina judgments and the Alabama Final Judgment of Divorce, the Creditor claims she is owed, interest included, a total of $263,217.33. (Claim No. 7.) She claims that the entire outstanding amount is entitled to priority under 11 U.S.C. § 507(a)(1)(A), and that a portion of that amount

Case 18-04268-DSC13    Doc 92    Filed 07/03/19    Entered 07/03/19 17:28:48    Desc Main
Document      Page 10 of 41

($208,692.01) is also secured by virtue of the liens created under the certificates of judgment recorded in the appropriate Alabama counties. (Claim No. 7.)

**5. Chapter 13 Plan**

When the Debtor filed his chapter 13 case, he listed the Creditor on Schedule E with a priority unsecured debt of $50,000 (domestic support obligation), and on Schedule F with general unsecured (nonpriority) debts of $108,612.14 (equitable distribution), $48,188.15 (attorney fees), and $30,950.85 (attorney fees).

The Debtor's initial chapter 13 plan (doc. 2) proposed to pay the Creditor's $50,000 DSO as a priority claim with fixed payments of $1,000 monthly beginning April 2019. This plan also proposed to treat the Creditor's other three debts of $108,612.14, $48,188.15, and $30,950.85 as general unsecured claims; meaning these claims would receive only partial payment, on a pro rata basis, with other general unsecured claims from a pot of funds paid by the Debtor in the amount of $25,080.

The Debtor amended his chapter 13 plan on January 11, 2019 (doc. 22) and proposed to pay $1,000 monthly on the priority DSO of $48,629.54 beginning in April 2019, $11,000 annually on the priority attorney's fees of $54,968.16, and $350 annually on the priority prepetition DSO shortage of $1,725. The amended plan still treated the Creditor's remaining debts as general unsecured claims that would receive only partial payment, on a pro rata basis, with other general unsecured claims from a pot of funds paid by the Debtor in the amount of $25,080.

The Debtor filed a second amended chapter 13 plan on January 16, 2019 (doc. 28) that hastened the distribution of payments to the Creditor for her three priority claims by a few months, but did not otherwise change the terms of the amended plan. In sum, the Debtor's latest plan (doc. 28) proposed to pay the Creditor $105,322.70 of the debts owed to her, not pay $157,894.63 of the

debts owed to her, and receive a discharge of the unpaid balance at the completion of his 5-year plan.

### 6. Credibility Issues

Courts in North Carolina and Alabama have judged the Debtor's conduct unfavorably. The evidentiary hearing in this case provided this Court an opportunity to independently assess the Debtor's credibility, or a lack thereof. To begin, there was the Debtor's initial failure to disclose the sports memorabilia that he purchased for the Minor Child, and his claim that this nondisclosure was unintentional. It seems unlikely that the Debtor would forget the Minor Child's sports memorabilia, which he valued at nearly $3,500 – seven times more than he valued his own memorabilia. In his bankruptcy petition, the Debtor valued his sports memorabilia, which he inventoried at 794 items, at $500. This is notwithstanding the fact that the day before the Debtor filed his bankruptcy petition, he valued his sports memorabilia at $2,000 in an Alabama state court document. (Creditor Ex. 14.) Moreover, it was not until the Debtor's PayPal and eBay records were subpoenaed that he disclosed the additional 460 items which he claims were purchased for the Minor Child.

Other instances where the Court was able to assess the Debtor's credibility included his testimony concerning a football helmet and baseball bat pictured in a photograph from the Debtor's residence. (Creditor Ex. 28.) The Debtor testified that he sold these two items, which were pictured in a 2017 photograph, but when examined about the same, he could not identify them on his itemized list of "sold" memorabilia dated July 5, 2017 through August 25, 2018. (Debtor Ex. 6.) Pictured in that same photograph was a Daniel A. Moore print of "The Interception."[8] The Debtor

---

[8]    While there was no testimony establishing that this Daniel A. Moore print was, in fact, "The Interception," the undersigned takes judicial notice of the same. The scene from the photographed print clearly depicts Alabama football player Antonio Langham's game-winning interception against the Florida Gators in the 1992 SEC Championship.

Case 18-04268-DSC13    Doc 92    Filed 07/03/19    Entered 07/03/19 17:28:48    Desc Main
Document    Page 12 of 41

testified that the print was not his – it belonged to Ms. Thomas. Ms. Thomas, who had not heard the Debtor's testimony due to her sequestration under Rule 615, testified differently. She stated that she gave the print to the Debtor as Christmas present, revealing yet another inconsistency.

As alluded to above, the Debtor claimed rent and utility expenses in the amount of $1,000 in a prepetition state court document that was filed on October 18, 2018, the day before he filed his bankruptcy petition. (Creditor's Ex. 14.) In this bankruptcy case, however, he claimed he did not pay rent. At trial, the Creditor referenced this discrepancy and offered evidence that Ms. Thomas received $1,000 payments from the Beasley Trust thirteen times during 2018 to infer that rent payments were being made. (Creditor Ex. 22.) Moreover, in the same state court document where the Debtor claimed $1,000 rent obligations, he also claimed that he used a $12,000 bonus "to accommodate expenses related to his move to Birmingham, AL to be closer to his son and for his new job." (*Id.*) That bonus was from 2018, however, and the debtor had moved to Alabama two years earlier. He was impeached regarding this contradiction at the evidentiary hearing; admitting that he moved to Alabama in 2016, the Debtor acknowledged that his verified response was inaccurate. (*Id.*) The Creditor offered the Debtor's bank records to prove that he spent the 2018 bonus within approximately thirty days of receiving it, while subject to two contempt orders in North Carolina for not paying domestic support. (Creditor Ex. 17.)

The Debtor's testimony concerning his parents' trust afforded this Court yet another opportunity to judge his credibility. The Debtor did not disclose the trust in his bankruptcy petition nor his sworn interrogatory answers. And he testified that he did not know that he was a beneficiary to the trust until the trust records were subpoenaed in this case. Yet, the Equitable Distribution Judgment (entered in June 2017, over a year before he filed for bankruptcy) specifically mentions

13

the fact that the Debtor is "the secondary trustee of his parent's trust." (Doc. 19, Ex. at ¶ 68(c).) Moreover, the Beasley trust has paid over $100,000 to the Debtor, his legal counsel, and Ms. Thomas, on checks that clearly state the name of the account as the "Robert and Mauveline Trust, Brad Beasley TTE." (Creditor Ex. 31, 33.)

Finally, the Debtor's testimony about his use of the debit card drawn on his parents' personal checking account reflected upon his credibility. The Debtor testified that he used his parents' debit card for his parents' care. The Debtor's parents live in an assisted-living home in Decatur, Alabama, and they do not drive. Most of the charges on the debit card, however, were from the Birmingham area where the Debtor resides.[9] (Creditor Ex. 21.) The charges included purchases from car washes, numerous restaurants, and Victoria's Secret, totaling $9,412.98. (*Id.*) The Court is not persuaded that the majority of the purchases were for anything other than the Debtor's personal expenses including non-essential items.

## CONCLUSIONS OF LAW

The Creditor objects to plan confirmation and seeks an order denying confirmation and dismissing this case or converting it to chapter 7. (*See* Doc. 19 at 16.) As for the Debtor, he objects to the Creditor's claim on grounds that it is excessive, it includes items that are not priority DSOs, and for the additional reason that there is no property of the estate to secure the Creditor's proof of claim. (Doc. 23.) "The burden of proof on plan confirmation generally rests with the Debtor." *Jones v. Jones (In re Jones),* No. 17-5113-AEC, 2018 WL 1940380, *1, *2 n.1 (M.D. Ga. Feb. 1, 2018), citing *In re Hubbard,* 569 B.R. 188, 191 (Bankr. M.D. Ala. 2017); *In re Pearson,* 398 B.R. 97, 102 (Bankr. M.D. Ga. 2008). Regarding the Creditor's proof of claim, it "enjoys prima facie

---

[9]     The Court notes that the Debtor's brother, Dr. Brad Beasley, lives in Athens, Alabama, nearly 100 miles from Birmingham.

validity under Federal Rule of Bankruptcy Procedure 3001(f); this creates a presumption in favor of allowance of the claim." *Jones*, 2018 WL 1940380, at *2. The Debtor "bears the burden of rebutting the presumption through 'facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim.'" *Id.* citing *In re Crutchfield*, 492 B.R. 60, 69 (Bankr. M.D. Ga. 2013) (quoting *In re LJL Truck Ctr., Inc.*, 299 B.R. 663, 666 (Bankr. M.D. Ga. 2003)). If the Debtor "'overcomes the prima facie case, then the burden of proof falls to the party that would bear the burden outside of bankruptcy.'" *Id.* citing *Walston v. PYOD, LLC (In re Walston),* 606 Fed.Appx. 543, 546 (11th Cir. 2015)(citing *Raleigh v. Ill. Dep't of Revenue,* 530 U.S. 15, 20, 120 S. Ct. 1951, 147 L.Ed. 13 (2000); 9 *Collier on Bankruptcy* ¶ 3001.09[2] (16th ed. 2015) ). *See In re Dunbar*, No. 03–BK–03506–PMG, 2005 WL 852585, at *2 (Bankr. M.D. Fla. Mar. 30, 2005) (stating creditor has the "ultimate burden as to validity and amount of the claim" after objection).

The Creditor's position requires the Court to consider whether the Debtor is current on his postpetition DSOs; whether the plan properly provides for DSO claims entitled to § 507 priority and full payment; whether the Creditor's claim is secured and, if so, whether it is provided for by the plan; and whether the Debtor filed his petition and plan in good faith. The determination of these issues is likewise pertinent to the resolution of the Claim Objection. Turning to those issues, the Court first considers whether the Debtor is current on his postpetition DSOs.

### 1. The Debtor's Postpetition DSOs

Section 1325(a)(8) provides that the court shall confirm a plan if "the debtor has paid all amounts that are required to be paid under a domestic support obligation and that first become payable after the date of the filing of the petition if the debtor is required by a judicial or administrative order, or by statute, to pay such domestic support obligation." 11 U.S.C. § 1325(a)(8). Creditor contends that when she filed the Objection to Confirmation, "the Debtor was

15

past-due on $1,310.50 in postpetition domestic support payments . . ." and $200 for the Minor Child's medical expenses incurred by the Creditor in December 2018. (Doc. 19 at ¶ 26.) Testimony at trial, however, established that the Debtor is now current on the DSOs that have become payable since the filing of his chapter 13 petition. (*See* Debtor Ex. 9.)

In closing arguments, the Creditor submitted that it was not until she filed an objection to the plan and a motion to dismiss that the Debtor "started remaining current" on his postpetition DSOs. While that may be correct, the evidence before the Court indicates the Debtor is now current. Therefore, the Court is unpersuaded that this ground serves as an impediment to confirmation. Nor does the Court find that dismissal is warranted under 11 U.S.C. § 1307(c)(11), which provides that the court *may* dismiss a case for "failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition." 11 U.S.C. § 1307(c)(11). To begin, dismissal is not mandatory here. Further, the Code instructs that this Court shall confirm a plan if "the debtor has paid all amounts required to be paid under a domestic support obligation and that first become payable after the date of the filing of the petition." 11 U.S.C. § 1325(a)(8). The evidence before the Court is that the Debtor is current on the DSOs that have come due since the filing of his chapter 13 bankruptcy. Thus, to the extent the Debtor's postpetition DSOs were not current initially, they are now; and being current prior to plan confirmation is what the Code requires here.

**2.  Does the Plan Propose to Pay Priority Claims in Full?**

The more difficult question is whether the Debtor's plan proposes to pay priority claims in full. Resolving this question turns on the nature of the Equitable Distribution Judgment and the Sanctions Order and whether either or both are effectively DSOs entitled to priority and, consequently, payment in full. Stated otherwise, this Court must decide whether the debts owed to

16

the Creditor by the Debtor are "in the nature of support." *See Cummings v. Cummings,* 244 F.3d 1263, 1264 (11th Cir. 2001.) The Debtor's second amended chapter 13 plan provides for payment of DSO arrears ($48,629.54), attorney fees ($54,968.16), and a prepetition DSO shortage ($1,725). (Doc. 28 at 4.) It does not, however, provide for payment of the Equitable Distribution Judgment in the amount of $119,623.55 or the Sanctions Order in the amount of $34,091.30. (Claim No. 7.) The Debtor claims that the Equitable Distribution Judgment is "merely a property settlement," not a DSO. [10] (Doc. 24 at ¶ 10.) And he claims that the Sanctions Order was for "willful malicious behavior" which is dischargeable in this chapter 13 case. (*Id.*) The Creditor contends otherwise, arguing that both the Equitable Distribution Judgment and the Sanctions Order are in the "nature of domestic support." (Doc. 19 at ¶ 35.)

### 3. The Equitable Distribution Judgment

Turning first to the Equitable Distribution Judgment, the Court concludes that it is "in the nature of support" and is therefore a claim entitled to priority under 11 U.S.C. § 507(a)(1)(A). In reaching this conclusion, this Court is mindful of the clear directives from the Eleventh Circuit in determining whether an obligation is for domestic support. One such directive instructs bankruptcy courts to "undertake 'a simple inquiry as to whether the obligation can legitimately be characterized as support, that is, whether it is in the *nature* of support." *Cummings*, 244 F.3d at 1265, citing *In re Harrell,* 754 F.2d 902, 906 (11th Cir. 1985). This means that the bankruptcy

---

[10]    "It should be noted that the support versus property settlement distinction is still relevant for the purposes of determining whether a debt is entitled to priority." *Leroy Davis v. Betty Davis (In re Davis)*, No. 06-10581, WL 4510367, at *3 (Bankr. M.D. Ala. 2007) If the Equitable Distribution Judgment is "in the nature of support," and therefore a DSO, it is entitled to priority status and must be paid in full under a chapter 13 plan. *See* 11 U.S.C. §§ 507(a)(1) and 1322(a)(2). On the other hand, if the Equitable Distribution Judgment is a property settlement, as the Debtor urges, it does not have priority and need not be paid in full in his chapter 13 plan. *See In re Hause*, No. 6:15-bk-00457-CCJ, 2015 WL 7251662, at *2 (Bankr. M.D. Fla. 2015) ("Debts not in the nature of support, but rather of property settlements, do not fall within this [DSO] definition.").

court "should look beyond the label the parties have given to a particular debt and determine whether the debt is actually in the nature of alimony or support." *Id*. "Thus, a debt is a domestic support obligation if the parties intended it to function as support or alimony, even if they called it something else."[11] *In re Benson,* 441 F. App'x at 651, citing *Cummings,* 244 F.3d at 1265.

Federal law controls whether a given obligation is in the nature of support. *See In re Strickland*, 90 F.3d 444, 446 (11th Cir. 1996). But "[t]he court's decision should also be informed by state law." *In re Benson,* 441 F. App'x at 651, citing *Cummings,* 244 F.3d at 1265. Beyond federal and state law considerations, there are other factors to consider as well. They include:

> (1) the agreement's language; (2) the parties' financial positions when the agreement was made; (3) the amount of the division; (4) whether the obligation ends upon death or remarriage of the beneficiary; (5) the frequency and number of payments; (6) whether the agreement waives other support rights; (7) whether the obligation can be modified or enforced in state court; and finally (8) how the obligation is treated for tax purposes.

*In re Benson*, 441 F. App'x. at 651, citing *In re McCollum,* 415 B.R. 625, 631 (Bankr. M.D. Ga. 2009). The "'touchstone' for determining the difference between domestic support and property settlement obligations is the intent of the parties." *Jones,* 2018 WL 1940380, at *2 (M.D. Ga. Feb.

---

[11]     As recently noted by Judge Carter in a case from the Middle District of Georgia: "In deciding whether an obligation is a domestic support obligation in the plan confirmation context, the court may look to guidance from cases concerning dischargeability under 11 U.S.C. § 523(a)(5). *Wade v. Cunningham (In re Wade)*, No. 13–67411–BEM, 2014 WL 3672137, at *3 & n.2. (Bankr. N.D. Ga. April 30, 2014). *See also Brunson v. Austin (In re Austin)*, 271 B.R. 97, 104 (Bankr. E.D. Va. 2001) ("Although the priority status accorded to a claim determined to be in the nature of support is based upon § 507, courts have used the case law interpreting § 523(a)(5) to determine whether the subject debt is actually in the nature of alimony, maintenance or support because the language of § 507(a)(7) [now codified as § 507(a)(1)(A) after enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA")] mirrors that of § 523(a)(5).")." *Jones,* 2018 WL 1940380, at *2 n.1 (M.D. Ga. Feb. 1, 2018). Additionally, the Court notes here, that BAPCPA amended the priority scheme under § 507(a) to move prepetition domestic support obligations to a first priority position. *See In re Resendiz*, No. 12-10603, 2013 WL 6152921, *1, *2 (Bankr. S.D. Tex. Nov. 20, 2013). "Prior to the BAPCPA amendments, claims for alimony, maintenance or support were entitled to seventh priority under §507(a)(7)." *Id.*

1, 2018), citing *Cummings,* 244 F.3d at 1266.[12] To that end, *Cummings* provides, that "'[a]ll evidence, direct or circumstantial, which tends to illuminate the parties subjective intent is relevant.'" *Id.* citing *In re Brody*, 3 F.3d 35, 38 (2d Cir. 1993).

Because it is the touchstone, this Court begins its analysis with the consideration of intent. Not surprisingly, the parties disagree over the intended purpose of the Equitable Distribution Judgment. The Creditor urges that the Equitable Distribution Judgment was intended for support, while the Debtor contends that it is nothing more than a nonpriority property settlement. Having considered all the evidence in order to discern the intent of the subject obligation, this Court concludes that the evidence weighs in favor of finding that the Equitable Distribution Judgment was intended to support the Creditor. To begin, the Equitable Distribution Judgment made certain findings regarding income, financial dispositions, and the Creditor's need for additional training and education, all of which connote support more than property division. Those findings include:

64 a.    Husband is employed by CBRE in Birmingham, Alabama as a Director of Supply Chain Management.  Husband began working for CBRE in August of 2016 and pursuant to his 2016 Form W2 earns $149,089.58 per year. Wife is pursuing a degree to get additional training to re-enter the workforce. Wife has been a homemaker and stay-at-home mother since the birth of the parties' minor child on January 10, 2010.

64 c.    From 2000 through 2002, Wife worked and supported the family while Husband obtained his Bachelor's Degree in Management Information Systems from the University of Alabama in Birmingham. Thereafter, Wife supported Husband as he built his employment seniority. Wife continued to work until the birth of the parties' minor child on January 10, 2010. After the birth of the parties' minor child, Wife managed the household and cared for the parties' minor child, which increased Husband's earning potential. Wife put her career on hold to attend to the needs of Husband, the minor

---

[12]    The *Cummings* decision is cited often within the Eleventh Circuit as the standard for determining whether a particular debt is domestic support obligation. This Court notes that courts outside the Eleventh Circuit frequently cite *Cummings* as well. Notably, at least one North Carolina bankruptcy court has followed *Cummings* as have other courts within the Fourth Circuit. *Bristow v. Bristow (In re Bristow)*, No. 04-50235, 2005 WL 1321996, *1, *3 (Bankr. M.D.N.C. Feb. 5, 2005); *see also Lawrence v. Combs (In re Combs),* 543 B.R. 780, 784 (Bankr. E.D. Va. 2016).

Case 18-04268-DSC13    Doc 92    Filed 07/03/19    Entered 07/03/19 17:28:48    Desc Main
Document      Page 19 of 41

child, their family, and household. Wife needs additional training to re-enter the workforce.

64 f.   Wife needs additional training and education to re-enter the workforce.

68 b.   That Wife is not a beneficiary of any wills, trusts, or estates.

68 c.   That Husband is the secondary trustee of his parents' trust. Both of Husband's parents are in assisted living. Husband's parents former home sold for $528,000 recently, which does not include the other assets that were auctioned.

(Doc. 19, Ex. C at ¶ 64(a),(c),(f.); ¶ 68(b),(c).) This Court finds significant the North Carolina state court's reference, more than once, to the Creditor's needs for additional training to re-enter the workforce. Coupled with the fact that the North Carolina state court described how the Creditor supported the Debtor in his education and career, and "put her career on hold" to take care of his needs and their family, the Creditor has shown how and why she needs support from the Debtor. Thus, the language, the references, and the characterization of spousal circumstances evince a nature of support.

The language in the Equitable Distribution Judgment also provided: "The distributive award to Wife in the amount of $108,612.14, is a secured debt and not subject to discharge in any subsequent bankruptcy proceeding initiated by Husband." (Doc. 19, Ex. C at ¶ 82.) This statement is made three times throughout the judgment. (*See id.* at ¶ 82 (findings of fact), ¶11 (conclusions of law), ¶10 (ruling).) The Court does not find these statements definitive on the ultimate issue of whether this debt is subject to discharge. The Bankruptcy Code is the sole authority on that point. The statements are, however, probative of the North Carolina state court's intent. To that end, the statements articulate an intent for the Equitable Distribution Judgment to survive a bankruptcy discharge – a proposition that necessarily requires the Judgment to be in the nature of support.

20

An additional factor weighing in favor of finding that the Equitable Distribution Judgment is in the nature of support concerns the financial positions of the parties when the judgment was entered. In this case, the Creditor was unemployed when the Equitable Distribution Judgment was entered. She had been a stay-at-home mother since 2010. (*See* Doc. 19, Ex. C at ¶ 64 (a).) The Debtor, by contrast, worked for his current employer earning a sizable salary. (*Id.*) This financial disparity bodes in the Creditor's favor. Add the fact that the Minor Child is involved for whom the Creditor has primary physical custody, and the scales tip further in favor of finding the Equitable Distribution Judgment is in the nature of support. Judge Carter's opinion in *In re Jones* puts a fine point on it, discussing the significance of these considerations:

> "The end result of an exercise of this sort is usually a mixed bag with factors pointing in both directions." *Kolodziej v. Reines (In re Reines)*, 142 F.3d 970, 973 (7th Cir. 1998). However, *Collier on Bankruptcy* suggests that the relative financial situation of the parties is "[p]erhaps the most important factor considered by the bankruptcy courts in evaluating the intentions of the parties." 4 *Collier on Bankruptcy* ¶ 523.11[6][b] (16th ed. 2015). "Courts are more likely to consider an obligation a [domestic support obligation] if (1) there is considerable income disparity between the parties, and (2) without Debtor paying the obligation, the party with lower income is unable to support him or herself and any minor children." *Clark v. Clark (In re Clark)*, 574 B.R. 598, 605–06 (Bankr. S.D. W. Va. 2017). In considering relative income disparity, the Court may also consider relevant variables such as each party's prior work experience and abilities, physical health, potential earning power, employment prospects, and probable future needs. *Brunson v. Austin (In re Austin)*, 271 B.R. 97, 107–08 (Bankr. E.D. Va. 2001).

*Jones*, 2018 WL 1940380, at *2–3.

Here, the Creditor's prior work experience ended when she became a stay-at-home mother in 2010. She "put her career on hold to attend to the needs of Husband, the Minor Child, their family, and household." (Doc. 19, Ex. C at ¶ 64 (c).) For employment prospects, she needed additional training and education. And, being unemployed, the income disparity between the Debtor and the Creditor was considerable. Moreover, the parties were married for over 16 years

prior to separation. These facts are not unlike those in *In re Bristow* where a North Carolina bankruptcy court found a distributive award in the nature of support:

> Turning to the facts in the present case, the court first recognizes that the parties were married for 24 years. Thus, the length of the marriage was significant. For an appreciable portion of the marriage, the Plaintiff remained out of the public work force to provide care for the couple's children and support to her husband and his work with Bristow Grading. These facts weigh in favor of a finding that the disputed obligations were intended to be in the nature of alimony, support or maintenance. The parties' financial circumstances at the time of the entry of the Equitable Distribution Judgment and the Alimony Judgment also weigh in favor of finding that the Distributive Award is in the nature of alimony or support. The Defendant was employed by his own successful grading business with profits of $81,814.00 in 2001, while the Plaintiff earned $25,406.00 in 2001. Because the Defendant gained experience and established himself in the grading industry during the course of the marriage, while the Plaintiff remained at home to care for the couple's children, the Defendant's earning capacity was much greater than the Plaintiff's at the time of the divorce.

*In re Bristow*, 2005 WL 1321996, at *4 (Bankr. M.D.N.C. 2005).

Moreover, in *Bristow,* the bankruptcy court utilized factors similar to Eleventh Circuit analysis for determining whether an obligation was in the nature of support. Indeed, the *Bristow* court cited *Cummings* for the proposition that "[t]he court must not rely simply on the label used by the parties or state court, but must look beyond the label to examine whether the debt actually is in the nature of support or alimony." *Id.* at * 3, citing *Cummings*, 244 F.3d at 1265. This was a different approach than that taken in *Perlow v. Perlow*, 128 B.R. 412 (E.D.N.C. 1991), where the district court found that a right to equitable distribution was a general unsecured claim. In *Perlow,* the court did not consider whether the equitable distribution was in the nature of support. *See generally, Perlow,* 128 B.R. at 412. That issue was not before the court. (*Id.*) Instead, the district court considered a different inquiry: whether a right to equitable distribution was a "preexisting property right in marital property" or a debt. *Id.* at 415. The creditor argued that her right to equitable distribution, which had not yet occurred, was not dischargeable because it was "not a

22

debt or claim against the debtor's property but instead a preexisting property right in the marital property." *Id.* The district court disagreed. It held that the creditor's vested right to equitable distribution did not create a property right in marital property, she had only a claim – a general unsecured claim that was "properly listed as a debt against the estate." *Id.* But *Perlow* is not on point with the instant case. Here, unlike *Perlow*, the valuing of marital property and the Equitable Distribution Judgment occurred before the Debtor filed his chapter 13 bankruptcy case. Thus, the analysis important to the *Perlow* court regarding rights being "cut off by the bankruptcy filing", is of no moment here. *Id.* And in this case, there is no dispute that the Equitable Distribution Judgment is, in fact, a debt; rather, the dispute is whether that debt is entitled priority and full payment under the Debtor's plan because it is a DSO. *Perlow* did not answer that question. Thus, to the extent North Carolina jurisprudence is persuasive here, the *Bristow* decision counts as factually analogous and on-point, whereas *Perlow* is distinguishable.

Thus, the language of the Equitable Distribution Judgment, the income disparity, the Creditor's need for additional training to re-enter the workforce, the presence of the Minor Child for whom the Creditor had primary physical custody, and the significant length of the marriage all weigh in the Creditor's favor and, concomitantly, a finding that the Equitable Distribution Judgment is in the nature of support. There is also the fact that the North Carolina state court reserved ruling on the alimony order until "after entry and consideration of the written Equitable Distribution Judgment," suggesting, perhaps, that the court awaited a determination of how much support was afforded in the Equitable Distribution Judgment before awarding the alimony. (Doc. 19, Ex. G at ¶ 13.) The Equitable Distribution Judgment is payable in four installments and can be domesticated in any jurisdiction where the Debtor resides. (Doc. 19, Ex. C at ¶ 9, 12 (ruling).) It does not indicate that it ends upon death or re-marriage, nor is there any indication of how it should

Case 18-04268-DSC13    Doc 92    Filed 07/03/19    Entered 07/03/19 17:28:48    Desc Main
Document      Page 23 of 41

be treated for tax purposes. So, while some factors may point in both directions, this Court finds that a majority of the relevant factors indicate the Equitable Distribution Judgment is in the nature of support.

Beyond articulations of support-based intention found within the Equitable Distribution Judgment, there is also the Alabama state court's treatment of the Equitable Distribution Judgment. The Alabama state court registered the Equitable Distribution Judgment pursuant to an Alabama statute that provides "a support order or income-withholding order of another state or a foreign support order may be registered in this state,"[13] the implication being that registration pursuant to this statute necessarily means the Alabama state court considered it a support order. Perhaps an even stronger indication that the Alabama state court recognized the Equitable Distribution Judgment as a support order was the fact that the court found the Debtor in contempt of it. The Equitable Distribution Judgment ordered the Debtor to pay the distributive award in four (4) lump sum payments. (Doc. 19, Ex. C at ¶ 9 (ruling).) He failed to do so. When the case arrived in Alabama, the Alabama state court found him in contempt for a total of four (4) separate occasions "for his failure and/or refusal to satisfy said judgments." (Doc. 19, Ex. H at ¶ 7.) The Alabama state court did not expressly limit its contempt finding to just the Equitable Distribution Judgment, but it cited contempt on "four separate occasions" which coincides with the Equitable Distribution Judgment's required payment on four separate occasions. Thus, it appears that the Equitable Distribution Judgment was the precise judgment the Alabama state court had in mind when finding the Debtor in contempt.[14] If so, then the Alabama state court also considered it a support obligation.

---

[13]     As statutory authority for registering the Creditor's foreign judgments, the Alabama state court cited to Alabama Code § 30-3A-602.   (Doc. 19, Ex. E at ¶ 2.)  That statute is now codified as Alabama Code § 30-3D-602.

[14]     While this Court is persuaded that the Alabama state court perceived the Equitable Distribution Judgment as a support order, the Court is not convinced the same is true for the Sanctions Order. It is true

Case 18-04268-DSC13    Doc 92    Filed 07/03/19    Entered 07/03/19 17:28:48    Desc Main
Document      Page 24 of 41

*See In re Strength*, No. 12-12115, 2013 WL 752476, at *3 (Bankr. M.D. Ala. 2013) ("The alimony/support versus property settlement distinction was essential to the Circuit Court action because only a breach of an obligation to pay alimony/support is enforceable by contempt proceedings."). Regardless of the Alabama state court's perception, this Court concludes for the reasons articulated above that the Equitable Distribution Judgment is in the nature of support, must be treated as such for purposes of plan confirmation and the Claim Objection, and is therefore entitled to priority under 11 U.S.C. § 507(a)(1)(A) and full payment, in deferred cash payments, under 11 U.S.C. § 1322(a)(2).

### 4. The Sanctions Order

The Sanctions Order, which the Debtor argues is dischargeable, awarded attorney fees to the Creditor as a sanction. (Doc. 19, Ex. D at ¶ 6 (conclusions of law).) The Order provided: "As sanctions against Plaintiff [Debtor], an award should be entered for reasonable attorney fees related to Defendant's counterclaim for equitable distribution in the amount of $30,950.84 to be paid by Plaintiff [Debtor] on behalf of Defendant [Creditor], as a sanction for his actions which violated North Carolina General Statutes § 50-21(e)." *Id.* The North Carolina statute referenced in the subject order states:

> (e) Upon motion of either party or upon the court's own initiative, the court shall impose an appropriate sanction on a party when the court finds that:
> (1) The party has willfully obstructed or unreasonably delayed, or has attempted to obstruct or unreasonably delay, discovery proceedings, including failure to make discovery pursuant to G.S. 1A-1, Rule 37, or has willfully obstructed or unreasonably delayed or attempted to obstruct or unreasonably delay any pending equitable distribution proceeding, and
> (2) The willful obstruction or unreasonable delay of the proceedings is or would be prejudicial to the interests of the opposing party.

---

that the Alabama state court referenced the Sanctions Order with the other judgments. But it is also true that the Alabama state court's finding of contempt under the outstanding judgments was issued for four (4) separate occasions, which correspond with the four (4) payments required under the Equitable Distribution Judgment which the Debtor did not pay. (Doc. 19, Ex. H at ¶ 7.)

N.C. Gen. Stat. § 50-21. Thus, because the North Carolina state court found that the Debtor engaged in "willful obstruction and unreasonable delay" in connection with the equitable distribution proceedings, attorney fees were awarded as a sanction.

This Court recognizes that the Sanctions Order was related to the Equitable Distribution Judgment. It said as much. And in that sense, the Order had a connection to an underlying support order. But does that connection automatically mean the Sanctions Order is also in the nature of support? Or, must the Sanctions Order independently satisfy the threshold of being "in the nature of support"? The Creditor argues that "[b]ecause the Order for Sanctions is an award of costs and fees in connection with the Equitable Distribution Judgment, it is likewise a nondischargeable, priority obligation in the nature of support." (Doc. 19 at ¶ 39.) And she cites two cases for the general proposition that "[a]ttorneys fees incurred in connection with alimony or support awards are generally deemed to be within the exception to discharge under §523(a)(5)." (Doc. 19 at ¶ 34, citing *In re Patrick,* 106 B.R. 743, 745 (Bankr. S.D. Fla. 1989), *In re Konicki,* 208 B.R. 572, 574 (Bankr. M.D. Fla. 1997)). While the Court agrees generally with that proposition, it does not wrap up this issue as neatly as Creditor would have it.

The primary focus of the Sanctions Order was the Debtor's conduct. The Order discussed the Debtor's past and present conduct and recited findings of egregious conduct prior to and during the equitable distribution proceedings. (Doc. 19, Ex. D at ¶ 20.) It recounted the Debtor's misconduct post-separation, his failure to cooperate and participate in court proceedings prior to the equitable distribution proceedings, and his "utter lack of regard to the judicial process." (*Id.* at ¶ 12.) It found that the Debtor "willfully obstructed and unreasonably delayed discovery proceedings." (*Id.* at ¶ 21.) And, regarding the equitable distribution proceeding, the Order found that the Debtor "willfully obstructed and unreasonably delayed the equitable distribution

26

proceeding by simply refusing to participate." (*Id.*) Tracking the language of the North Carolina statute, the Order referenced the Debtor's willful obstruction and unreasonable delay several times, leading the North Carolina state court to conclude: "In light of Plaintiff's [Debtor's] actions, which are inexcusable, Plaintiff [Debtor] should pay for all of Defendant's [Creditor's] attorney fees related to the equitable distribution claims and Plaintiff [Debtor] through his actions or inactions has brought this on himself." (*Id.* at ¶¶ 21, 22, 29, 3 (conclusions of law); *id.* at ¶ 24.)

The gist of the Sanctions Order, therefore, concerned punishing misconduct. It did not say that it was in the nature of support. Nor did it discuss the respective wages or the ability of the parties to pay, and there were no facts in the Order that attempted to reconcile any financial disparity. Simply put, the nature of the fee award was to punish the Debtor rather than to support the Creditor. Obviously, by awarding her attorney fees there was some ensuing benefit to the Creditor; indeed, her expenses were reduced. But the Court is unpersuaded that this benefit was anything more than a consequence of the punishment. The main purpose of the Order was to punish. And any reduction in expenses for the Creditor was incidental to the purpose of punishment, not the purpose itself. That being the case, this Court is unconvinced that the Sanctions Order was in the nature of support. *See In re Millner*, No. 14-62557-WLH, 2015 WL 1933408, at *3 (Bankr. N.D. Ga. April 23, 2015) ("Finally, it is doubtful that any such award would be nondischargeable under Section 523(a)(5) as the nature of an award of such fees would be to punish the Debtor and to benefit Aldridge rather than to benefit the children." (citing *In re Rackley,* 502 B.R. at 625 (fees awarded as a sanction were not in the nature of support)).

In *In re Spence*, the bankruptcy court considered "whether a Debtor may avoid judicial liens stemming from sanctions against him, in the form of attorney's fees payable to his former spouse . . . or whether, to the contrary, the liens constitute unavoidable domestic support

27

obligations." *In re Spence*, No. 02-12093-BKC-AJC, 2009 WL 3483741, *1,*3 (Bankr. S.D. Fla.

Oct. 26, 2009). Although the context of the determination in *Spence* (avoidance of judicial lien)

was different than it is here (plan confirmation and claim objection), the analysis is the same. In

*Spence,* the court concluded:

> The Court's determination is consistent with Eleventh Circuit cases wherein attorney's fees stemming from family court proceedings have been deemed to be "in support" of the creditor when they are awarded based on the relative *financial need,* not the divorce proceedings *conduct,* of the respective parties. *See Strickland,* 90 F.3d 444 (11th Cir.1996) (attorney's fees award, as an obligation based on the *parties' relative need and ability to pay,* was meant to support dependent, and thus is nondischargable); *Harrell,* 754 F.2d at 906 (payments awarded in part to *pay child support and educational expenses* were "actually in the nature of alimony"); *Manz,* 355 B.R. at 351 (denying summary judgment to debtor seeking to avoid attorney's fees because facts alleged by plaintiff—that "original trial-court award of fees was based on the *relative financial position of the parties* "—would have, if proven, been sufficient to show that the fees were in the nature of support); *Finlayson,* 217 B.R. at 666 (attorney's fees award was in nature of support where family court order showed the award was based on the *disparity in the parties' financial positions* ); *In re Beardsley,* 118 B.R. 120, 122 (Bankr. M.D. Fla. 1990) ("In light of the fact that the court orders regarding the parties' dissolution of marriage and subsequent related proceedings that are in this record all deal with the Debtor's obligation to pay child support, medical expenses, and attorney fees ... the attorneys fees awarded to the Plaintiff are, in fact, intertwined with the child support and medical insurance obligations," and thus are in the nature of support.).
>
>     . . . .
>
> Sanctions in the form of attorney's fees stemming from bad-faith litigation misconduct in a divorce proceeding are *punishment* for the wrongful actor, not a domestic obligation meant to *support* the other party, particularly where consideration of the parties' respective ability to pay legal fees is wholly absent from the record. Because such is the case here, the Court finds unpersuasive Creditors' argument that the judicial liens currently encumbering Debtor's property are unavoidable domestic support obligations.

*Spence*, 2009 WL 3483741, at *4. In reaching this conclusion, the *Spence* court cited *In re Lopez*

where attorney fees resulting from "'bad-faith litigation misconduct' of the former spouse during

divorce proceedings" were held not to constitute a DSO because the "misconduct, and not financial

28

need, spurred the award of fees." *Id.* at \*3 (citing *In re Lopez*, 405 B.R. 382, 385 (Bankr. S.D. Fla. 2009).[15]

More recently, in *In re Mosely*, 577 B.R. 419 (Bankr. N.D. Ga. 2017), the bankruptcy court held that a debtor's obligation to pay his ex-spouse's attorney fees was not a DSO when awarded by a state court in connection with the debtor's unsuccessful efforts to modify the divorce. In that case, the court rejected an argument that the attorney fee award was in the nature of support even though the state court order said as much. Indeed, the court held:

> The $13,000 Fee Order does contain some self-serving language clearly directed at this issue. More specifically, it says that "all payments of attorneys' fees and other arrearages herein are deemed to be in the nature of support owed from Plaintiff to Defendant, all as stipulated to, consented to, and agreed to by the parties herein, to be non-dischargeable in bankruptcy." $13,000 Fee Order, ¶ 6. It is, of course, insufficient for these purposes that these amounts were "deemed" to be support, or that the parties agreed that it was support or that it was nondischargeable. The attorneys' fees must actually constitute support. In the absence of an express determination by the Superior Court that the attorneys' fees were awarded as support based upon the relative financial circumstances of the parties, this Court cannot find that they constitute support based on the record in this case. Because it has not been established that the Fee Award is in the nature of support, the Fee Award does not constitute a DSO and thus is not a priority claim in this case.

*Mosely v. Mosely* (*In re Mosely*), 577 B.R. 419, 426–27 (Bankr. N.D. Ga. 2017). Without "an express determination," the state court's basis for the fee award was not clear. And, as a result, the bankruptcy court noted, it was possible that the fees were awarded as a sanction for frivolous litigation; the implication being that such fees (sanctions) would not be in the nature of support. *Id.* at 426-27.

---

[15]  This Court also notes persuasive authority from outside the Eleventh Circuit reaching a similar conclusion. *See e.g. In re Sharf*, No. 15-00568, 2016 WL 3437523, \*1, \*4 ("In *In re Olsson*, 532 B.R. 810, 812-13 (D. Oregon 2015) a district judge found in a Section 523(a)(5) nondischargeability action that an attorney fee award entered to sanction a party for filing a meritless motion was dischargeable because the award was not intended to be in the nature of support and was not based on the recipient's need for support. . . Here too, the Sanction Award does not appear to be designed to support the Plaintiff but to punish the Defendant for noncompliance with discovery. The Court finds that the Sanction Obligation is dischargeable.").

Case 18-04268-DSC13   Doc 92   Filed 07/03/19   Entered 07/03/19 17:28:48   Desc Main
Document      Page 29 of 41

As in *Mosely*, "in the absence of an express determination that the attorney fees were awarded as support based on the relative financial circumstances of the parties, this Court cannot find that they constitute support based on the record in this case." *Mosely,* 577 B.R. at 426-27. The Sanctions Order focused on the Debtor's misconduct and punished him for the same. Accordingly, the Court is unpersuaded that the Sanctions Order was in the nature of support or entitled to priority.

**5.  Whether the Plan Provided for Payment of the Creditor's Secured Claim**

The Creditor asserts that a portion of her claim, $208,692.01, is secured and not provided for by the Debtor's proposed plan. (Doc. 19 at ¶¶ 41-44.) She has provided this Court with certificates of judgment purportedly recorded in the Alabama probate courts for Shelby, Jefferson, and Madison counties. (Doc. 19, Ex. F.) And she takes the position that she has a "judicial lien on all of the Debtor's assets in the amount of $208,692.01." (Doc. 19 at ¶¶ 41.) According to the Creditor, the Debtor's assets include "over $150,000.00 worth of Sports Memorabilia." (*Id.* at ¶ 44.) The Debtor claims otherwise – countering that "[n]one of the claim is secured as there is no property of the Estate that could be attached to make it a secured claim." (Doc. 23 at ¶ 3.)

The Creditor's position is based, in part, on the fact that the North Carolina state court previously valued the Debtor's sports memorabilia at $190,000. (Doc. 19 at ¶ 42.) Hence, she argues, there is a vast discrepancy between the North Carolina state court's valuation and the $500 that the Debtor now claims his sports memorabilia is worth on his bankruptcy schedules. And she is correct about this value gap. But the fact remains that no evidence was presented to this Court to show that the Debtor still owns a stockpile of sports memorabilia.[16] The only property to which

---

[16]     Without further evidence of substantial undisclosed sports items or the Debtor's disposal thereof, the Court must decide this issue based upon the evidence presented rather than the inferences and presumptions stemming from the Debtor's prepetition conduct.

30

the Creditor's claim can attach includes the items scheduled in the Debtor's petition, and those items *not* scheduled in the petition but evidenced before this Court as assets of the estate; namely, the Daniel A. Moore print of "The Interception," the payments received from his parents' trust, and the sports memorabilia purchased for the Minor Child.[17] Thus, the Creditor's claim is only secured to the extent of the value of these assets, $109,038.51.[18]

### 6. Whether the Debtor Filed His Petition in Good Faith

The Creditor also objected to plan confirmation (and moved for dismissal or conversion) on grounds that the Debtor filed his petition and his plan in bad faith. (Doc. 19.) As is often the case, this Court must make two distinct good faith determinations. *Matter of Love*, 957 F.2d 1350, 1354 (7th Cir. 1992) ("[t]he bankruptcy court is often called to make two separate good faith determinations in Chapter 13 proceedings."). The first good faith determination is whether the Debtor filed the Chapter 13 petition in good faith. *See Love,* 957 F.2d at 1354. The second is "whether a Chapter 13 plan, which lists projected debt and proposes a schedule of payment to creditors, is proposed in good faith." *Id.* As explained in *In re O'Neal*:

> Prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (hereinafter "BAPCPA"), the Code required only that the plan be proposed in good faith. Section 1325(a) did not require the court find as a prerequisite to confirmation that the debtor filed the petition itself in good faith. *In*

---

[17]    The other sports memorabilia that were ruled by the North Carolina state court to be in the Debtor's possession are not included here because, unlike the payments from Robert and Mauveline's trust, practically every aspect of the sports memorabilia remains in heavy dispute. In addition, neither party has established the whereabouts or disposition of most of these items, and this information is not necessary to decide the bankruptcy issues before this Court.

[18]    The valuation of assets at $109,038.51 is based upon evidence in the record.  In his petition, the Debtor valued his sports memorabilia at $500. (Doc. 1.) "The Interception" by Daniel A. Moore is valued at $475. That is the same value that the North Carolina state court assigned to another Daniel A. Moore print identified in the Equitable Distribution Judgment. (Doc. 19, Ex. C at 64.) The present value of the Debtor's interest is his parent's trust is $104,566.52, the amount distributed to him, his legal counsel, and his fiancée. (Creditor Ex. 22.) The value of sports memorabilia purchased by the Debtor for the Minor Child is $3,496.99, the amount disclosed in the Debtor's supplemental responses to Interrogatories and Requests for Production. (Debtor's Ex. 11.) These values total $109,038.51.

31

*re Kitchens,* 702 F.3d 885, 888–89 (11th Cir.1983) (providing a list of non-exclusive factors to assist bankruptcy courts in determining whether the debtor proposed a plan in good faith); *see also In re Gibson,* 45 B.R. 783, 786 (Bankr. N.D. Ga. 1985) (Drake, J.). Yet, section 1307(c) permitted bankruptcy courts to dismiss cases under section 1307(c) upon finding that the debtor filed the petition in bad faith. *See In re Waldron,* 785 F.2d 936 (11th Cir.1986); *see also Marrama v. Citizens Bank of Massachusetts,* 549 U.S. 365, 373, 127 S. Ct. 1105, 1111 (2007) ("Bankruptcy courts nevertheless routinely treat dismissal for prepetition bad-faith conduct as implicitly authorized by the words 'for cause.'").

BAPCPA added section 1325(a)(7), which requires a finding that the debtor also filed the petition in good faith. Following the BAPCPA amendments, some courts have recognized that subsections 1325(a)(3) and 1325(a)(7) impose two distinct confirmation requirements. *See In re McCreary,* 2009 WL 5215587 (Bankr. C.D. Ill. 2009). An analysis of the debtor's good faith in filing the petition and in the filing of the plan should not be identical. *See In re Tomer,* 2009 WL 2029798, *5 (W.D. Va. July 14, 2009). Otherwise, the addition of section 1325(a)(7) would have been unnecessary and the new requirement superfluous. Some overlap in the factors may exist, however, as both requirements serve to ensure that a debtor does not use Chapter 13 to abuse " 'the provisions, purpose, or spirit of [Chapter 13]....' " *In re Love,* 957 F.2d 1350, 1357 (7th Cir.1992) (citations omitted).

*In re O'Neal*, No. 11-13535-WHD, 2012 WL 1940594, at *5–6 (Bankr. N.D. Ga. 2012).

"The finding of a lack of good faith in filing the petition under Section 1307(c) can lead to the dismissal and termination of the bankruptcy proceedings . . . or it can lead to an order to convert the case and proceed under Chapter 7 of the Bankruptcy Code." *Love,* 957 F.2d at 1355, citing 11 U.S.C.A. § 1307(c). But "[t]he lack of good faith in the filing of the plan under Section 1325(a), on the other hand, does not always lead to such a harsh result." *Id.* Thus, "[w]hile a determination that a petition has not been filed in good faith would likely result in dismissal, a determination that a plan has not been filed in good faith would, in most cases, result in an opportunity to propose another plan." *In re McCreary*, No. 09-81743, 2009 WL 5215587, at *2 (Bankr. C.D. Ill. 2009).[19]

---

[19]      As noted in *In re McCreary,* "[p]rior to the enactment of the Bankruptcy Abuse and Consumer Protection Act of 2005, a debtor's lack of good faith in filing a bankruptcy petition was sufficient cause for dismissal or conversion of the case. 11 U.S.C. § 1307 (c). *Matter of Love,* 957 F.2d 1350, 1354 (7th

Regarding the filing of the petition itself, the Court considers "objective evidence of a fundamentally unfair result and subjective evidence that a debtor filed a petition for a fundamentally unfair purpose." *McCreary,* 2009 WL 5215587, at *3 (citing *In re Love,* 957 F.2d 1350 (7th Cir.1992))." This evidence informs the pertinent inquiry because "[a]t bottom, the essential question before the Court is whether the debtor filed the petition for a "'greedy and unworthy purpose.'" *O'Neal*, 2012 WL 1940594 at *6 (citing *In re Waldron,* 785 F.2d 936 (11th Cir. 1986) for the proposition that "debtors filed petition in bad faith where they were not insolvent or otherwise in financial distress and filed the case solely for the purpose of rejecting an executory contract; use of bankruptcy relief as 'sword by the rapacious,' rather than as a shield, was an abuse of the intended purpose of the Bankruptcy Code."). A non-exhaustive list of factors has emerged "[t]o assist in the determination of whether the debtor filed the case for a 'fundamentally unfair purpose.'" *O'Neal*, 2012 WL 1940594 at *6. These factors include "the nature of the debt, including the question of whether the debt would be nondischargeable in a Chapter 7 proceeding; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors." *Id.,* citing *Love,* 957 F.2d at 1357.

Having considered these factors in the context of the evidence, the testimony, the parties' submissions, and the arguments of counsel, the Court overrules the portion of the Objection to Confirmation and denies the motion to dismiss or convert that allege the petition was filed in bad

---

Cir.1992). The majority of courts analyzing the issue since the addition of Section 1325(a)(7), which requires a finding that the petition was filed in good faith as a condition to plan confirmation, have applied those same basic standards." *See In re McCreary*, No. 09-81743, 2009 WL 52115587, *1, *2 (Bankr. C.D. Ill. Dec. 29, 2009); citing *In re Tomer,* 2009 WL 2029798 (W.D.Va.2009), *In re Shafer,* 393 B.R. 655 (Bankr.W.D.Wis.2008).

faith. While the Debtor falls well short of being the "honest but unfortunate debtor" referenced in many bankruptcy decisions, his motivation for filing–to stay out of jail and keep his job–is not uncommon. And frankly, the Debtor staying out of jail and keeping his job seems the most likely way for the Creditor to recoup a significant portion of the money owed to her. Regardless, the Court is unpersuaded, on the facts before it, that the Debtor filed his chapter 13 petition for a fundamentally unfair, greedy, or unworthy purpose.

The Court has considered the nature of the debts to the Creditor, and the fact that most of them would be nondischargeable in a chapter 7 case. But the Court has also considered the difference between the Debtor's treatment of the debts before and after this chapter 13 case was filed. For example, before filing for chapter 13 bankruptcy, the Debtor spent his employment bonus shortly after receiving it and paid none of it toward his outstanding debts to the Creditor. Since filing for chapter 13 bankruptcy, however, the Debtor has paid his bonus ($11,858.02) directly to the chapter 13 trustee. (Debtor Ex. 8.) He has also made his monthly plan payments consistently to the chapter 13 trustee. (*Id.*) According to the chapter 13 trustee's records, the Debtor has paid $23,730.02 into his chapter 13 case, as of May 20, 2019. (*Id.*) And, since filing, he is current on reimbursing the Creditor for the Minor Child's medical expenses, as he is required to do. The Debtor prepared and submitted to this Court a spreadsheet detailing several categories: his gross pay, wage garnishment for alimony, wage garnishment for bankruptcy, his net pay, additional alimony paid, and medical expenses for the Minor Child's medical expenses. (Debtor's Ex. 9.) The spreadsheet begins with the November 2, 2018, paycheck and ends with the May 17, 2019, paycheck. (*Id.*) It is substantiated, in part, by the Trustee's records, which indicate that consistent and regular payments are now being made for the benefit of the Creditor. (Debtor's Ex. 8.) Nor does the evidence before the Court, which shows the Creditor is now being paid, suggest a

fundamentally unfair result given the Debtor's lack of payment before filing his chapter 13 case. Accordingly, the Objection to Confirmation on grounds that the petition was filed in bad faith is overruled and the motion to dismiss or convert on the same ground is denied.

### 7. Whether the Debtor Proposed the Plan in Good Faith

Section 1325 of the Bankruptcy Code provides that a debtor's plan of reorganization must be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1325(a)(3). And "[i]t is well established that when a debtor seeks to confirm her Chapter 13 Plan, the burden is on her to prove her good faith." *In re Fulmer*, 535 B.R. 854, 858–59 (Bankr. M.D. Ala. 2015) (citing 11 U.S.C. § 1325(a)(3)); *In re Smith,* 328 B.R. 797, 801 (Bankr. W.D. Mo. 2005) (holding that while the creditor has the initial burden to produce some evidence of lack of good faith, the ultimate burden is on the debtor to prove his good faith); *see also In re Kearney,* 439 B.R. 694, 697–98 (Bankr. E.D. Wis. 2010); *In re Delbrugge,* 347 B.R. 536, 540 (Bankr. N.D. W. Va. 2006); *In re Maronde,* 332 B.R. 593, 597 (Bankr. D. Minn. 2005)). "Analysis of a debtor's good faith in a Chapter 13 case requires examination of the debtor's behavior both pre-petition and post-petition." *In re Brown*, No. 6:08-cv-1517-Orl-18DAB, 2008 WL 5050081, *1, *2 (M.D. Fla. 2008), citing *In re McGovern,* 297 B.R. 650, 658 (S.D. Fla. 2003); *see also In re Wilcox*, 251 B.R. 59, 67 (Bankr. E.D. Ark. 2000) ("While a chapter 13 debtor's prepetition conduct is not determinative on the issue of good faith, it is relevant to the totality of circumstances analysis.").

Courts frequently remark that the concept of "good faith" is not defined in the Bankruptcy Code. *See Brown,* 2008 WL 5050081 at *2;  *In re McGovern*, 297 B.R. 650, 656 (S.D. Fla. 2003) ("Although this pervasive element of 'good faith' is described as 'one of the central, perhaps the most important confirmation finding to be made by the court in any Chapter 13 case,' *In re Kull,* 12 B.R. 654, 658 (S.D. Ga. 1981), *aff'd sub. nom, In re Kitchens,* 702 F.2d 885 (11th Cir.1983), the concept of 'good faith' is not defined in the Code or its legislative history.") And so, they

generally hold that good faith in this context is to be determined on a case-by-case basis, under a "totality of the circumstances" test that requires consideration of a broad range of objective and subjective factors. *See In re Kitchens,* 702 F.2d 885, 888-89 (11th Cir. 1983). These factors include:

> (1) the amount of the debtor's income from all sources; (2) the living expenses of the debtor and his or her dependents; (3) the amount of attorney's fees; (4) the probable or expected duration of the debtor's Chapter 13 plan; (5) the motivations of the debtor and his sincerity in seeking relief under the provisions of Chapter 13; (6) the debtor's degree of effort; (7) the debtor's ability to earn and the likelihood of fluctuation in his earnings; (8) special circumstances such as inordinate medical expense; (9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act and its predecessors; (10) the circumstances under which the debtor contracted the debts and his or her demonstrated bona fides, or lack of same, in dealings with his creditors; and (11) the burden which the plan's administration would place on the trustee.

*Id.*[20]

"*Kitchens* directs a Court to consider not only the honesty of a debtor, but also a debtor's motivation in proposing [his] plan." *In re Shelton*, 370 B.R. 861, 867 (Bankr. N.D. Ga. 2007). While the Court is not persuaded that the Debtor lacked good faith in filing the petition, his honesty and motivation in proposing the plan comprise a distinct inquiry. *In re Zizza*, 500 B.R. 288, 293 (1st Cir. B.A.P. Mass. 2013) ("There are two separate and distinct tranches of good faith in Chapter 13 cases.").

"The easiest way to violate § 1325(a)(3) is to misrepresent, lie, or otherwise mislead the court." *Shelton*, 370 B.R. at 868, citing *See In re LeMaire,* 898 F.2d at 1352. Here, there are discrepancies between the evidence and the Debtor's trial testimony that call into question his

---

[20]    With the passage of BAPCPA, some of these factors are subsumed by specific provisions of § 1325(b). *In re Johnson*, 346 B.R. 256, 261 (Bankr. S.D. Ga. 2006). Notwithstanding, however, "under BAPCPA, the totality-of-the-circumstances approach appears to remain a relevant inquiry." *In re Shelton*, 370 B.R. 861, 867 (Bankr. N.D. Ga. 2007).

36

credibility. The Debtor testified that he sold a football helmet and baseball bat pictured in a photograph from his residence, but he was unable to identify those items on a list of his sold sports memorabilia. He testified a Daniel A. Moore print of "The Interception" was not his, but his fiancée testified she gave it to him for Christmas. He testified that he only used his parents' (who live in Decatur, Alabama, and do not drive) debit card to purchase items for their well-being, yet there were over $9,000 dollars' worth of transactions from Birmingham area restaurants, car washes, and stores. The Court finds these inconsistencies probative of the Debtor's overall credibility.

There are also troubling discrepancies among statements that the Debtor made to different courts. In an Alabama state court document filed one day before his chapter 13 bankruptcy petition, the Debtor claimed rent and utility expenses in the amount of $1,000. (Creditor Ex. 14.) In this bankruptcy case, however, he claimed he does not pay rent. Moreover, the Creditor offered evidence that Ms. Thomas received $1,000 payments from the Beasley Trust thirteen times during 2018. (Creditor Ex. 22.) An additional discrepancy concerns the Debtor's sports memorabilia. In his bankruptcy petition, the Debtor valued his sports memorabilia, which he inventoried at 794 items, at $500. But in an Alabama state court document that was filed the day before his chapter 13 bankruptcy petition, he valued his sports memorabilia at $2,000. (Creditor Ex. 14.)

Moreover, the Debtor was untruthful about a $12,000 bonus in an Alabama state court filing. In a prepetition Alabama state court document, he falsely claimed that he used his $12,000 bonus in 2018 "to accommodate expenses related to his move to Birmingham, AL to be closer to his son and for his new job." (Creditor Ex. 14.) However, at the time of this claim by the Debtor, two years had passed since he had moved. And at the evidentiary hearing before this Court, the Creditor offered the Debtor's bank records to prove that he spent the 2018 bonus within

37

approximately thirty days of receiving it, while subject to two contempt orders in North Carolina for failing to pay domestic support. (Creditor Ex. 17.)

The Court finds the Debtor's egregious prepetition conduct, as documented throughout various state court orders, relevant to the determination of whether this chapter 13 plan was proposed in good faith. His lack of candor in state court filings and his disregard for state court orders is well-documented. As noted directly above, the Debtor spent a $12,000 bonus while two contempt orders were pending against him for failing to pay his DSOs. He has failed to comply with state court orders and to pay his DSOs during the three-year pendency of domestic litigation in two states. All the while he "has continued to travel and take vacations, has continued to purchase sports memorabilia, continues to attend sporting events, and continued to pay his own expenses, including non-essential items." (Doc. 19, Ex. H at ¶ 6.)

The Debtor also failed to make critical disclosures about assets and to meet statutory standards about his income and DSO payments until forced to do so by either the Creditor or this Court. He valued his sports memorabilia at $500 in his bankruptcy petition, and at $2,000 the day before in Alabama state court. Then, when the PayPal invoices came in, it was revealed that he purchased an additional 460 items worth almost $3,500 for the Minor Child. Nor did the Debtor disclose, in either sworn interrogatory answers or his schedules, his interest in his parents' trust. In fact, despite there being over $100,000 in trust payments to him, his legal counsel, and his fiancée, and despite the fact that a North Carolina state court specifically referenced his secondary trustee status to the trust in the Equitable Distribution Judgment, the Debtor never disclosed anything about the trust until compelled by this Court to do so. This nondisclosure, especially given the significant amount of money at issue, seems at the least inconsistent with the spirit of the Bankruptcy Code and notions of good faith.

38

There are many instances where the Debtor's testimony is inconsistent with or contradicted by the evidence in this case. While no single failure to disclose or single discrepancy necessarily proves a lack of good faith, they do add up. And when the Court's analysis requires consideration of a totality of the circumstances as it does here, those nondisclosures and discrepancies make a difference. As such, this Court finds that based on the totality of Debtor's prepetition and postpetition conduct, discrepancies between the evidence and the Debtor's testimony, as well as his failures to disclose timely, the Debtor has failed to carry his burden of proving that his second amended chapter 13 plan was proposed in good faith. Accordingly, the Creditor's objection to plan confirmation pursuant to 11 U.S.C. § 1325(a)(3) is sustained in accordance with the Court's ruling below.

## CONCLUSION

This Court's decision will not end the disputes between Brian and Leigh. With so much water under the bridge, there is no win-win scenario here. Nevertheless, this Court must decide the issues before it by adhering to the Bankruptcy Code, equitable principles, and binding precedent. With all those tenets in mind, this Court concludes that the Debtor must do more if he wishes to remain in this chapter 13 case. His current plan fails to provide for full payment of the Equitable Distribution Judgment. That judgment, however, has enough hallmarks of support to persuade this Court that it is an obligation that "can legitimately be characterized as support" and is therefore entitled to priority. *Cummings*, 244 F.3d at 1265. On the other hand, the Sanctions Order sought to punish the Debtor rather than support the Creditor, and it is therefore ruled a general unsecured (nonpriority) claim.

Certainly, the domestic cases in state court and this chapter 13 case have been painful and onerous for both the Debtor and the Creditor. Nonetheless, the Court postulates that the Debtor

39

may prefer an opportunity to propose a third amended plan that provides a greater dividend for the general unsecured claims, including that of the Creditor, over other nonbankruptcy scenarios. And, consistent with the intention professed by the Debtor during the evidentiary hearing, he gets another chance to make things right. Therefore, it is **ORDERED, ADJUDGED,** and **DECREED** that:

1. The Creditor's Objection to Confirmation is **SUSTAINED in part** and confirmation of the Debtor's second amended chapter 13 plan filed January 16, 2019 (doc. 28) is **DENIED**. The Creditor's Motion to Dismiss or Convert Case to Chapter 7 is **DENIED**, subject to the conditions in paragraph 3 below.

2. The Debtor's Claim Objection is **SUSTAINED in part** and **OVERRULED in part**. Claim No. 7 filed by the Creditor is allowed with a secured portion of $109,038.51, a priority unsecured portion of $120,087.52, and a general unsecured (nonpriority) portion of $34,091.30, for a total claim of $263,217.33.

3. The Debtor has **fourteen (14) days** from the entry of this Order to propose a third amended chapter 13 plan that:

   a. complies with 11 U.S.C. § 1325(a)(5) by providing for the secured portion of the Creditor's claim consistent with the terms of this Order;

   b. complies with 11 U.S.C. § 1322(a)(2) by providing for full payment, in deferred cash payments, of all claims entitled to priority under § 507, including the priority unsecured claims of Creditor as determined in this Order;

   c. overcomes the Debtor's bad faith conduct and complies with the good faith requirements of 11 U.S.C. §1325(a)(3), the Circuit Court's holding in *Kitchens,*

and the instant Order, by proposing a greater dividend to general unsecured claims, including that of the Creditor.

4. If the Debtor timely files a third amended chapter 13 plan, the Clerk of Court shall schedule a confirmation hearing for said plan and objections, if any. If the Debtor does not timely file a third amended chapter 13 plan, the Creditor's Motion to Dismiss shall be **granted**, and this chapter 13 case shall be **dismissed**.

Dated: July 3, 2019                              /s/ D. Sims Crawford
                                                 D. SIMS CRAWFORD
                                                 United States Bankruptcy Judge

41